

AMICUS CURIAE BRIEF OF ELI JAMES IN SUPPORT OF PLAINTIFF DARRELL LEON MCCLANAHAN III

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF MISSOURI

Case No.: 3:25-CV-05025-MDH

Darrell Leon McClanahan III, Plaintiff,

v.

Donald J. Trump, et al., Defendants.

I. INTRODUCTION

I am Eli James, a minister of the Christian Identity faith, and I am submitting this Amicus Curiae Brief to respectfully support Plaintiff Darrell Leon McClanahan III's Complaint. His complaint challenges the constitutionality and application of Executive Order 13899. I am filing this brief under Federal Rule of Civil Procedure 24 and, to the extent it applies, Rule 375 of the Missouri Rules of Civil Procedure. As a religious minister, my theological interpretations and expressions are directly affected by federal actions that target specific religious viewpoints, so I have a compelling interest in the issues in this case. The issues Mr. McClanahan raises in his Complaint touch on fundamental First Amendment protections, including the free exercise of my religion, freedom of speech, and the right to petition the government for redress.

II. MY INTEREST AS AMICUS CURIAE

I have been a minister within the Christian Identity movement since 1999. This theological framework involves interpreting scripture through the lens of ethnic and genealogical identities, emphasizing a literal adherence to biblical genealogies. Because of my deeply held religious

1

perspective, I am uniquely positioned to speak about the religious implications of laws or executive orders that might restrict or criminalize dissenting interpretations of religious texts, identities, or historical narratives.

The First Amendment clearly states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." Executive Order 13899, along with the growing tendency to equate certain religious critiques with prohibited speech, directly undermines this core constitutional principle. I believe that labeling theological positions as "hate speech" is an impermissible prior restraint and viewpoint discrimination, violating the Constitution. My profound interest lies in safeguarding religious freedom and the unhindered expression of faith, especially when governmental or private actions favor specific religious denominations or political viewpoints over others.

III. MY ARGUMENT

This Amicus Brief addresses the central legal questions surrounding Executive Order 13899, especially how it defines and applies "anti-Semitism" and its impact on constitutionally protected speech and religious liberty.

A. The First Amendment and Religious Liberty

1. Constitutional Foundations of Free Speech

The United States Supreme Court has consistently stated that the government cannot regulate speech based on its content or viewpoint. As the Supreme Court held in Texas v. Johnson, "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."

Executive Order 13899, by adopting a definition of anti-Semitism that includes criticism of Israel and applying it to civil rights law enforcement, appears to be an encroachment upon the Establishment Clause. It is therefore an unconstitutional attempt to stifle specific viewpoints, especially religious critiques, under the guise of combating anti-Semitism. I believe such executive action contradicts established legal precedent that prohibits government favoritism toward particular groups or the suppression of dissenting thought.

2. Protection of Religious Speech

Religious speech has strong protection under the First Amendment. In Capitol Square Review & Advisory Bd. v. Pinette, the Supreme Court reaffirmed that religious individuals and organizations have equal access to the public square, free from government censorship or discrimination. The federal government should not privilege the sensitivities of one religious or ethnic group above others.

My Christian Identity belief system involves interpretations of the Bible that differ from mainstream Judeo-Christian doctrine. Labeling such theological positions as "hate speech," when they represent sincerely held religious beliefs, is, in my view, an impermissible attempt to punish heterodox belief. As the Supreme Court stated in West Virginia State Board of Education v. Barnette, "If there is any fixed star in our constitutional constellation, it is that no official… can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

B. The Ambiguity of "Anti-Semitism" and its Impact on Due Process

A fundamental principle of American law is that laws must be clear and precise to provide fair notice of what conduct is prohibited and to prevent arbitrary enforcement. I assert that, without a clear and universally accepted definition of "Semitism," any definition of "anti-Semitism" in a legal or executive order context risks being unconstitutionally vague and open to arbitrary application. For a law to be just, its terms must be precise.

3

Case 3:25-cv-05025-MDH    Document 19    Filed 05/28/25    Page 3 of 8

1. The Need for Definitional Clarity

The claim that "Abraham was a Jew" and the widespread equating of "anti-Semitism" solely with "anti-Judaism" need critical examination. In my biblical interpretation, Abraham fathered descendants through three wives—Sarah, Hagar, and Keturah—fulfilling the prophecy that he would be the "father of many nations." This understanding suggests that all of Abraham's descendants, including Arabs (descendants of Ishmael through Hagar) and other groups, are also Shemites.

The Merriam-Webster dictionary defines "Semite" as:
1a: a member of any of a number of peoples of ancient southwestern Asia including the Akkadians, Phoenicians, Hebrews, and Arabs
b: a descendant of these peoples
2: a member of a modern people speaking a Semitic language

Given this broad definition, I believe that exclusively associating "Semite" with "Jew" is a deliberate misrepresentation. If "Semite" encompasses various groups, then actions or policies targeting or harming non-Jewish Semitic peoples could, by definition, be considered "anti-Semitic" themselves. This perspective challenges the idea that only Jewish people can be victims of anti-Semitism, suggesting that a more comprehensive and inclusive understanding is needed if the term is to be used in legal contexts.

2. Implications of Executive Order 13899 on Dissenting Views

Executive Order 13899, particularly through its expanded application based on the International Holocaust Remembrance Alliance (IHRA) working definition of anti-Semitism, extends to certain criticisms of Israel. This directly impacts my ability, and that of others, to express religious and geopolitical viewpoints, including those rooted in Christian theological interpretations. For example, I believe that my deeply held religious views concerning the modern State of Israel and its actions, which may differ from mainstream political or religious opinions, are being stifled.

I note President Trump's White House Memorandum of January 29, 2025, "Additional Measures to Combat Anti-Semitism," which reinforces Executive Order 13899. While it states that civil rights laws protect American Jews to the same extent as all other American citizens, I argue that this protection should not extend to the suppression of legitimate critique or religious dissent, especially when the definition of "anti-Semitism" is so broadly applied as to encompass a wide range of expression. The right to dissent is a cornerstone of American tradition, and favoring one side in complex geopolitical or religious disputes risks undermining this fundamental freedom and potentially leading to societal friction.

C. The Chilling Effect and Private Censorship

The vagueness of Executive Order 13899, combined with its adoption of the IHRA definition, creates a significant chilling effect on protected speech, particularly within religious and academic discourse. Individuals may choose to censor themselves out of fear of being labeled "anti-Semitic" and face punitive action or social ostracism, even when their expressions are based on sincerely held beliefs or legitimate academic inquiry.

Furthermore, I believe this executive action has the potential to encourage private entities to engage in censorship. As Exhibit A demonstrates, I personally experienced alleged censorship by a web hosting service, PowWeb, at the alleged "order" of the Anti-Defamation League (ADL) on July 17, 2012. This incident, which occurred without any substantiation of threats, slander, or "hatred," serves as a concrete example of how the narrative around "anti-Semitism" can be used to suppress speech, even without direct government involvement. This alleged private censorship directly reinforces the "chilling effect" argument, showing that fears of suppression are not just hypothetical but have real consequences for individuals exercising their First Amendment rights.

## IV. CONCLUSION

For all these reasons, I, Eli James, respectfully ask this Court to grant the Plaintiff's request for declaratory and injunctive relief. Executive Order 13899, as it is being applied, poses a serious threat to the First and Fifth Amendments, particularly the protections of free speech, the free exercise of religion, and the Establishment Clause. It risks undermining the religious liberty of individuals like myself and the Plaintiff by creating an environment where legitimate religious, historical, or political critiques are chilled or suppressed under an overly broad and vague definition of "anti-Semitism."

Respectfully submitted,

*[signature: Eli James]*

Eli James

Address: 5037 River Birch Lane
Harrison AR 72601
Phone number: 217-962-8539
Email Address: elijosephjames2012@att.net

## CERTIFICATE OF SERVICE

I hereby certify that on this day, May 28, 2025, I filed the foregoing AMICUS CURIAE BRIEF OF ELI JAMES IN SUPPORT OF PLAINTIFF with the Clerk of Court for the United States District Court for the Western District of Missouri.

Eli James

EXHIBIT A

On July 17, 2012, I, Eli James, was allegedly victimized by the Anti-Defamation League of B'nai B'rith, resulting in what I believe was a denial of my First Amendment right to Freedom of Speech. Without providing any specific evidence of threats, slander, or "hatred," the Anti-Defamation League allegedly requested that PowWeb, a web hosting service, shut down my website. This action, as I understand it, arbitrarily censored my online expression.

ACKNOWLEDGEMENT

STATE OF <u>ARKANSAS</u>,

COUNTY OF <u>BOONE</u>} ss.

Subscribed and Sworn to (or affirmed) before me on this 27TH day of MAY 2025 before me, a notary public, personally appeared

<u>ELI JAMES</u>    *Eli James*

executed the foregoing instrument for the purposes therein contained.

My commission expires: 5-3-2031

*Jaylen Brooke Hale*
(Notary Public)

(Seal)
TAYLOR BROOKE HALE
Boone County - Arkansas
Notary Public # 12714359
My Commission Expires 5-03-2031