UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DARRELL LEON MCCLANAHAN III,

Plaintiff,                                    Case No. 3:25-cv-05025-MDH

v.

DONALD J. TRUMP, et al.,

Defendants.

## PLAINTIFF'S REPLY IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER

COMES NOW Plaintiff, Darrell Leon McClanahan III, appearing pro se, and respectfully submits this Reply in Support of his Renewed Motion for Temporary Restraining Order (ECF No. 10), in response to Defendants' Suggestions in Opposition (ECF No. 20 ECF No. of Government's Opposition]). I assert that Defendants fundamentally mischaracterize the nature of the imminent harm and chilling effect I face, and that the arguments presented in my Renewed Motion for TRO are sufficient to meet the high standard for injunctive relief.

**I. INTRODUCTION**

Defendants' Opposition attempts to dismiss my well-pleaded allegations of irreparable harm as mere "vague fears" and "subjective chill." This dismissal ignores the cumulative and undeniable pattern of government action, legislative efforts, and private coercion—directly linked to Executive Orders 13899 and 14188—that objectively and imminently threaten my First and Fifth Amendment rights. The very language of the challenged Executive Orders, coupled with subsequent enforcement actions and external pressures, creates a concrete and unavoidable chilling effect that demands immediate judicial intervention.

Defendants' dismissive tone and conclusory arguments are emblematic of an administration whose executive orders have faced widespread judicial rejection. This Court should be particularly skeptical of Defendants' assurances given the documented pattern of constitutional violations in similar executive actions.

## II. I HAVE DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM

Defendants incorrectly assert that I have failed to show irreparable harm, claiming "no adverse actions have been taken against Plaintiff." This assertion is a willful misrepresentation of the ongoing harm and the explicit purpose of a chilling effect doctrine.

### A. The Loss of First Amendment Freedoms Constitutes Irreparable Injury.

Defendants' argument that economic loss is remediable by damages, while true in isolation, fundamentally misapplies the core injury at stake here. As the Supreme Court held in Elrod v. Burns, 427 U.S. 347, 373 (1976), "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." I am not merely alleging economic harm; I am alleging the suppression of my constitutionally protected speech and religious exercise, which is an irreparable injury that no amount of monetary damages can cure. The threat of losing federal benefits is presented as one form of the coercive pressure exacerbating this irreparable injury to free speech, not as the sole or primary injury. Furthermore, I unequivocally assert that any

2

chilling of my protected speech, regardless of whether Defendants deem it "subjective," constitutes a direct and irreparable violation of my First Amendment rights. The government's attempt to label legitimate concerns about self-censorship as merely "subjective" disregards the very purpose of the chilling effect doctrine, which is to prevent government actions that deter individuals from exercising their rights out of fear.

### B. My Fears are Objectively Reasonable and Not Speculative, Directly Fueled by Defendants' Own Actions and Pronouncements.

Defendants characterize my fears as "vague" and "speculative," likening them to the insufficient claims in Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013), and Laird v. Tatum, 408 U.S. 1 (1972). This comparison is inapposite. Unlike purely speculative future harm, my fear of enforcement is objectively reasonable, based on concrete, post-complaint developments and Defendants' explicit pronouncements:

Defendants' argument that I must wait for actual enforcement action fundamentally misunderstands the purpose of preliminary relief. The Supreme Court has repeatedly held that plaintiffs need not expose themselves to liability before challenging allegedly unconstitutional laws. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158-59 (2014) (holding that "an allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'"). I have presented a substantial risk of impending harm.

* Federal Retaliation Against Universities: The direct freezing of federal funding to Harvard and Columbia Universities (¶ 15-18 of Renewed Mot.) is not speculative; it is a demonstrated action by the Defendants. This concrete punitive action, taken under the guise of combating antisemitism, establishes a clear, credible threat of similar economic retaliation against individuals, including myself, who do not conform to government-endorsed viewpoints. This action directly fulfills the Court's previous guidance that a renewed motion would be considered "if Defendants seek economic harm or federal retaliation."

3

* Federal Monitoring of Speech: The publicly acknowledged monitoring of social media content by ICE and USCIS (¶ 19-21 of Renewed Mot.) is an ongoing activity by federal agencies. Knowing that my political and religious speech related to Israel is under active surveillance by federal law enforcement agencies creates an objectively reasonable fear of future adverse action, compelling self-censorship. This is not a "subjective chill" arising from mere knowledge of activity; it is a fear based on known government surveillance directly aimed at the type of speech I may engage in.

* Government-Directed Censorship on Social Media (The Modern Public Square): My documented history of social media censorship, detailed in the Complaint, is now exacerbated by the explicit directive in EOs 13899 and 14188 for federal agencies to "aggressively combat antisemitism" and investigate critics of Israel. As established in Packingham v. North Carolina, 582 U.S. 98 (2017), the internet, including social media, serves as a vital "modern public square" for public discourse. The findings in Missouri v. Biden, 6 F.4th 376 (8th Cir. 2023), confirm a pattern of federal government coercion of private social media companies, which is now being amplified by the challenged Executive Orders. This is a direct government threat to my ability to engage in public discourse and reach voters in this crucial modern forum.

* Provocative Language and Intent of EOs – The "On American Streets" Threat: The explicit directive in Executive Order 13899 to "aggressively combat antisemitism... on American streets" (¶ 32-33 of Renewed Mot.) is not merely "confrontational and inflammatory"; it is a clear and alarming statement of intent to target and potentially suppress speech in traditional public forums. Defendants have made no mention of this specific, provocative language in their opposition, yet it is a central concern for me. Defendants' failure to address the specific 'American streets' language in EO 13899 is telling. When the government cannot defend its own provocative language, this Court should infer that such language cannot withstand constitutional scrutiny. This directive, emanating from the highest executive office, directly threatens my right to engage in political and religious discourse in public spaces, chilling my ability to exercise my First Amendment rights without fear of government reprisal or mischaracterization of my protected speech as hostile or even criminal. The government's silence on this specific wording, while simultaneously dismissing my fears as "subjective," is telling and highlights the direct pressure placed on individuals who express views that may be deemed "anti-Semitic" under the vague and overbroad IHRA definition. As a former

4

political candidate, I regularly engaged in public advocacy; this explicit threat of "aggressive combat" on "American streets" is a direct and imminent danger to my ability to speak freely in the public square and participate in the democratic process.

**C. The Nexus to Federal Government Action is Clear.**

Defendants attempt to dismiss several of my examples as not implicating "federal government action" (e.g., Missouri HB 937, private NGO advocacy, Missouri GOP ballot challenge). This argument ignores the pervasive reach of the Executive Orders and their intended effect.

The government attempts to dismiss individual examples as insufficient, but ignores the cumulative effect. Like death by a thousand cuts, the combined pressure from federal funding threats, surveillance, and inflammatory rhetoric creates an environment of government-sponsored intimidation that is precisely what the First Amendment seeks to prevent.

* Coercion of State and Private Actors: Executive Orders 13899 and 14188, particularly through their federal funding conditions and directives for "aggressive combat," provide a powerful incentive and explicit directive for state and private actors to align their policies with the federal government's broad interpretation of antisemitism. The Missouri HB 937, mirroring the IHRA definition, is a direct legislative response influenced by federal policy, creating a "double chilling effect" that stems from the federal directives. Likewise, private groups advocating "zero-tolerance policies" are doing so within a climate explicitly fostered by the Executive Orders' aggressive stance and threat of federal action. These are not isolated incidents but part of a concerted effort directly influenced by the challenged EOs.

* State Action Doctrine: When the federal government, through its executive orders and subsequent actions, coerces or significantly encourages private entities and state actors to suppress speech, those actions become imbued with state action and are subject to constitutional scrutiny. Norwood v. Harrison, 413 U.S. 455, 469 (1973). The web of

5

interactions detailed in the Renewed Motion demonstrates such governmental entanglement, particularly as federal agencies monitor speech and issue warnings to institutions.

### III. LIKELIHOOD OF SUCCESS ON THE MERITS REMAINS STRONG.

My constitutional claims for violations of the First Amendment (Free Speech, Establishment Clause) and Fifth Amendment (Due Process), as detailed in my Complaint and Renewed Motion, are robust. The new developments further solidify the likelihood of success on the merits.

#### A. Viewpoint Discrimination and Establishment of Religion:

The application of the IHRA definition, as evidenced by recent federal actions, unambiguously favors a specific viewpoint on Israel and risks establishing a government-preferred religious-political stance, directly violating the First Amendment. The arguments in the contemporaneously filed Amicus Curiae Brief from Eli James further elaborate on the religious liberty concerns, demonstrating how the definition targets specific theological interpretations, thus creating an unconstitutional religious test. Defendants' characterization of my protected speech as merely "anti-Semitic" serves as a prime example of the viewpoint discrimination at issue. I challenge the government's ability to define and suppress speech based on its content, particularly when that content relates to deeply held political or religious beliefs, not to advocate for "anti-Semitic" expression as broadly and pejoratively defined by Defendants.

#### B. Vagueness and Due Process:

The vagueness of the IHRA definition, coupled with aggressive enforcement (as seen in university funding freezes), continues to deprive individuals of fair notice and allows for arbitrary application, in violation of the Due Process Clause.

## IV. BALANCE OF EQUITIES AND PUBLIC INTEREST TIP DECIDEDLY FOR ME.

Defendants' perfunctory dismissal of the remaining Dataphase factors is inadequate.

### A. Balance of Equities:

The potential harm to the government in temporarily pausing the enforcement of an allegedly unconstitutional order is negligible compared to the irreparable harm I and other citizens face from the ongoing suppression of fundamental constitutional rights. The government has no legitimate interest in enforcing unconstitutional policies.

### B. Public Interest:

The public interest unequivocally favors the protection of free speech, religious liberty, and due process. Granting a TRO would safeguard the bedrock principles of our Republic, encourage open discourse on vital public issues, and prevent the government from wielding coercive power to silence dissent. Allowing the executive branch to define and punish speech in such a broad and vague manner sets a dangerous precedent for all citizens.

## V. CONCLUSION

I have clearly demonstrated that the enforcement of Executive Orders 13899 and 14188, combined with the subsequent federal and state actions directly influenced by these orders, creates an objectively reasonable and imminent threat of irreparable harm to my First and Fifth Amendment rights. The government's arguments rely on a narrow and inaccurate characterization of "harm" and ignore the established precedents regarding chilling effects and government coercion.

WHEREFORE, Plaintiff, Darrell Leon McClanahan III, respectfully requests that this Court GRANT his Renewed Motion for Temporary Restraining Order, and provide all other relief the Court deems just and proper.

May Justice prevail.


Respectfully submitted,

*/s/ Darrell McClanahan III*

DARRELL LEON MCCLANAHAN III,

Plaintiff, Pro Se

24346 S. 2425 Rd. Milo, MO 64767

417-388-9595

Darrell4mogov@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on this __30th___ day of May 2025, I electronically filed the foregoing PLAINTIFF'S REPLY IN SUPPORT OF RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER with the Clerk of Court for the United States District Court for the Western District of Missouri by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.